NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| A.B. ON BEHALF OF Y.F., a Minor Child,<br><br>      Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>      Defendant. | Civil Action No. 15-02143 (SDW)<br><br><br>OPINION<br><br><br>February 16, 2016 |

**WIGENTON,** District Judge.

Before the Court is Plaintiff A.B. ("Plaintiff") on behalf of her minor child Y.F.'s appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Elias Feuer's ("ALJ Feuer") denial of Plaintiff's claim for Supplemental Security Income ("SSI") child disability benefits under the Social Security Act (the "Act"). This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Venue is proper under 28 U.S.C. § 1391(b). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, this Court finds that ALJ Feuer's factual findings are not supported by substantial evidence. Therefore, the Commissioner's decision is **VACATED** and **REMANDED**.

I.  PROCEDURAL AND FACTUAL HISTORY

  A. **Procedural History**

On September 20, 2011, Plaintiff applied for SSI child disability benefits on behalf of her son Y.F., based on his diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"), Combined Type. (Y.F. Hr'g Sept. 26, 2013 Transcript (hereafter "Tr.") 9.) That claim was denied on November 22, 2011. (*Id.*) An application for reconsideration was subsequently denied on April 9, 2012. (*Id.*) Plaintiff appealed, and ALJ Feuer held a hearing on September 26, 2013. (*Id.*) ALJ Feuer issued his opinion denying SSI benefits to Plaintiff's child on December 19, 2013. (Tr. 6-22.) On February 20, 2014, Plaintiff requested that the Appeals Council review ALJ Feuer's denial of SSI benefits. (Tr. 5.) The Appeals Council denied the request for review on January 26, 2015, making the ALJ's decision the final decision of the Commissioner of Social Security. (Tr. 1-4.) Plaintiff now requests that this Court reverse the Commissioner's decision and remand for an award of SSI benefits. (Compl. 2.)

**B. Factual History**

Y.F. is nine years old and lives in Newark, NJ with his mother and four brothers. (Pet.'s Br. 24, *see* Tr. 266.) According to his mother, Y.F. began displaying attention and behavioral problems at the age of three. (Tr. 234.) In February 2011, while he was still in preschool, Y.F. started therapy at Mt. Carmel Guild Behavioral Center. (Tr. 234-37.) There, he underwent a psychiatric evaluation by Dr. Ronaldo Hong, who noted his "low frustration tolerance, impulsivity, and defiance," and recommended a therapeutic nursery program placement and a behavior modification program. (*Id.* at 236.)

In September 2011, when Y.F. was five years old, Dr. Dorothy Isecke, a child and adolescent psychiatrist at University Behavioral HealthCare ("UBHC"), diagnosed him with ADHD, Combined Type. (Tr. 266.) ADHD's essential feature is a "persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe

than is typically observed in individuals at a comparable level of development." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 85 (4th ed. 2000). ADHD, Combined Type is the most severe subtype of ADHD, and is only diagnosed when there are six or more symptoms of inattention and six or more symptoms of hyperactivity-impulsivity which have persisted for at least six months. (*Id.* at 87.)

Y.F has received both pharmaceutical and therapeutic treatments for behavioral problems since his ADHD diagnosis. Dr. Isecke prescribed 5 mg of Adderall medication daily at the initial appointment in September 2011, (Tr. 263, 266), and increased the dosage to 10 mg daily at a follow-up appointment the same month, (Tr. 258). Dr. Isecke also recommended therapy with Dr. Caroline Geelan, who noted Y.F.'s inability to focus and tendency to throw both temper tantrums and furniture. (Tr. 270, 335.)

In November 2011, after observing Y.F.'s behavioral and academic limitations on a daily basis for more than two months, Y.F.'s teacher completed a Social Security Administration ("SSA") Functional Assessment Questionnaire and indicated that Y.F. had marked, if not extreme, limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself.[1] (Tr. 195-202.) In the same month, a family worker at Y.F.'s preschool wrote a letter to NJ Disability Determination Services detailing Y.F.'s pattern of hitting teachers, running from the premises, abusing staff members, and excessively using inappropriate language. (Tr. 247.) The family worker also

---

[1] The teacher was asked to rate, on a scale of "1" to "5," Y.F.'s functioning (as compared to unimpaired children of the same age) in various activities in each of five domains. (Tr. 197-201); *see infra* Part II.B ¶ 2 (a sixth domain, health and physical well-being, was not rated on the same scale). A rating of "4" indicated "a serious problem" and a rating of "5" indicated "a very serious problem." (Tr. 197-201.) Y.F.'s schoolteacher rated his functioning a "4" or "5" for multiple activities in four of the five domains (the sole exception being moving about and manipulating objects). (*Id.*)

3

added that Y.F.'s behavior did not improve during the year, even though he attended the preschool in the afternoons after morning therapy at Mt. Carmel Guild. (*Id.*)

Dr. Joseph Nazareth, a pediatric neurologist and neuropsychiatrist referred by Newark Public Schools ("NPS"), evaluated Y.F. in June 2012 and confirmed Dr. Isecke's ADHD diagnosis. (Tr. 289.) He also diagnosed Y.F. with learning disabilities and perceptual deficits. (*Id.*) He recommended a structured classroom setting, academic remedies, and cognitive behavioral therapy. (*Id.*)

In the same month, a learning disabilities teacher consultant with the NPS evaluated Y.F.'s eligibility for special education classes, and observed Y.F.'s inability to maintain focus, impulsivity and carelessness in responding to test questions, refusal to attempt challenging tasks, and refusal to participate in activities with classmates. (Tr. 283-88.) During the evaluation, Y.F. threw himself on the floor, kicked school staff, and tried multiple times to leave the classroom without permission. (*Id.* at 285.) The teacher consultant added that Y.F.'s behavior inhibited his ability to achieve academically. (*Id.* at 288.) The June 2012 evaluation also included a functional behavioral assessment, which reported that Y.F. hit a classmate in the eye, refused to apologize, and pushed the teacher's belongings off her desk. (Tr. 320-24.) The assessment concluded that Y.F.'s primary issues were a lack of self-control, disregard for the rules, refusal to follow instructions, and destruction of school property, which were all less likely to occur when he engaged in an activity he enjoyed, such as playing computer games. (Tr. 324.)

As a result of these June 2012 assessments, the NPS Child Study Team ("CST") placed Y.F. in a small, self-contained, special education class for all of his academic subjects[2] and

---

[2] The Defendant points to Tr. 306 as evidence that the NPS CST decided to place Y.F. in a mainstream classroom for literacy and math classes (under "Program Determination," the assessment states "Behavior Disabilities (mainstream for literacy and math)"). (Def.'s Br. 4.) However, Y.F.'s Statement of Special Education and Related Services on Tr. 304 makes it clear that, regardless of what the CST's initial assessment may have been, Y.F. was

provided him with special accommodations, including extra time on tests and assignments, individualized instruction, and having test questions read aloud to him. (Tr. 304, 307.) The CST also assigned a full-time aide to Y.F. to rein in his violent behavior. (*See* Tr. 302, 304.)

Since July 2012, Y.F. has received regular treatment from Dr. Diane Kaufman, his current psychiatrist at UBHC. (Tr. 340.) At Y.F's first appointment, Dr. Kaufman confirmed the ADHD diagnosis and increased his Adderall dosage to 15 mg daily. (Tr. 334, 372.) In December 2012, because the Adderall was not working and caused irritability, Dr. Kaufman changed Y.F.'s prescription to 5 mg of Focalin XR every morning. (Tr. 340, 362, 366.) This was increased to 20 mg in April 2013. (Tr. 361.)

In June 2013, NPS conducted an annual review of Y.F.'s need for special accommodations and determined that he should remain in his self-contained special education class with his personal full-time aide because of continuing behavioral and medical challenges. (Tr. 385-400.) However, Y.F.'s caseworker concluded that Y.F. needed a new male aide to properly control his violent outbursts. (Tr. 406.) In addition, Y.F.'s teacher reported that he continued to display behavioral difficulties with respect to following rules and directions, maintaining self-control, focusing on his work, beginning a task, being organized, and being consistent in his performance. (Tr. 405.) Y.F.'s teacher also added that he had a low frustration level, a manipulative and argumentative nature, poor impulse control, poor internal controls, poor social skills, and a pattern of verbal outbursts and self-isolation. (*Id.*)

In July 2013, Dr. Kaufman added a 5 mg daily afternoon dose of Focalin to Y.F.'s 20 mg daily morning dose of Focalin XR. (Tr. 351.) She also prescribed 0.25 mg of Risperdal daily in August 2013 to alleviate Y.F.'s irritability, moodiness, and angry outbursts. (Tr. 340, 345.)

---

eventually placed in a special education classroom for all of his academic subjects during the 2012-2013 school year. This is confirmed by the June 2013 Annual Review Statement and Assessment. (Tr. 390, 392.)

5

Although Y.F. appeared to make progress in early to mid-2013,[3] (Tr. 343, 347-48, 358, 367), by late 2013 he had regressed.  In September 2013, Y.F.'s caseworker noted that, despite the presence of a male aide, Y.F. continued to exhibit violent outbursts and engage in behavior that could harm himself and others.  (Tr. 407.)  At the administrative hearing the same month, Plaintiff testified that Y.F. was at times placed in a crisis setting within the school, which separated him from the rest of the class until his problematic behavior could be controlled.  (Tr. 79-81.)  Plaintiff also testified that Y.F. was still hitting and fighting with people just as often as before, and that he had tantrums two or three days a week that involved slamming doors.  (Tr. 51, 88.)  She qualified her testimony by adding that she felt she could control Y.F.  (Tr. 68.)

In October 2013, two months after she requested feedback from Y.F.'s teachers, Dr. Kaufman wrote a letter stating that Y.F.'s ADHD remained active and that he continued to present "severe problems with attention, hyperactivity, impulsivity, and physical aggression which impact[] his ability to function at home, school, and in the community on a daily and ongoing basis." (Tr. 340.)  She also added in this letter, dated two weeks after the administrative hearing, that addressing Y.F.'s behavioral problems requires "a structured environment and a high level of supervision with ongoing redirection and repeated instruction."  (*Id.*)

## II.     LEGAL STANDARD

### A. Standard of Review

In Social Security appeals, this Court has plenary review of the legal issues decided by the Commissioner.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  Yet, this Court's review of

---

[3] There is indication in the record that any appearance of improvement was the result of Plaintiff's inconsistent statements to Y.F.'s doctors regarding his behavioral progress.  In early and mid-2013, Plaintiff reported that Y.F. was doing well at home and at school.  (Tr. 342, 347, 357, 362.)  At an August 2013 appointment, a month before the administrative hearing, Dr. Kaufman noted that Plaintiff "gives inconsistent accounts as of how [Y.F.] is doing per ADHD and behavior."  (Tr. 345.)  Dr. Kaufman then concluded that feedback from Y.F.'s teachers was needed to properly assess Y.F.'s behavioral progress at school.  (*Id.*)

the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted). Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (internal quotation marks omitted) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This Court is required to give substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (internal quotation marks omitted) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984) (citations omitted).

### B. The Three-Step Child Disability Test

A claimant's eligibility for social security benefits is governed by 42 U.S.C. § 1382. An individual under the age of 18 will be considered disabled under § 1614(a)(3)(C) of the Act if he (1) is not engaged in gainful substantial employment and (2) has a medically determinable physical or mental impairment that results in marked and severe functional limitations, and that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. A claimant must show that the "medical signs and findings" related to his ailment have been "established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . ." 42 U.S.C. § 423(d)(5)(A).

Even if an impairment does not meet, or is not medically equal to, the requirements of an impairment in the Listing of Impairments ("Listings"), 20 C.F.R. § 404, Subpart P, App. 1, the claimant may be disabled if his impairment or combination of impairments is functionally equivalent to a listed impairment. 20 C.F.R. § 416.926a. Functional equivalence is measured by

assessing the claimant's ability to function in terms of the following six domains, which are broad areas of functioning intended to capture all of what a child can or cannot do: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). An impairment or combination of impairments functionally equals a Listing if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(b)(1)(i-vi).

The SSA has established a three-step sequential process to evaluate the disability application of a minor. 20 C.F.R. § 416.924(a). In step one, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. If yes, the individual is not disabled and the claim is denied. 20 C.F.R. § 416.924(b).

If the claimant is not currently engaged in substantial gainful activity, then, in step two, the ALJ must determine whether the claimant has a severe and medically determinable impairment or combination of impairments. If not, the individual is not disabled and the claim is denied. 20 C.F.R. § 416.924(c).

If the claimant has a severe and medically determinable impairment, then, in step three, the ALJ must determine whether the claimant's impairment meets, medically equals, or functionally equals an impairment in the Listings. If the claimant's impairment meets or equals an impairment in the Listings, and meets the duration requirement, disability is presumed and benefits are awarded. 20 C.F.R. § 416.924(d). When the claimant's impairment does not meet or equal an impairment in the Listings, or does not meet the duration requirement, the individual is not disabled and the claim is denied. 20 C.F.R. § 416.924(d)(2).

### III. DISCUSSION
**A. The SSA's Decision**

On December 19, 2013, ALJ Feuer issued a decision concluding that Y.F. is not disabled. At step one, the ALJ found that Y.F. is not engaged in substantial gainful employment. At step two, the ALJ found that Y.F. suffers from a severe impairment, ADHD. (Tr. 12.) However, at step three, the ALJ concluded that Y.F.'s ADHD does not meet or medically equal the requirements of Listing 112.11 for ADHD because there is no evidence of marked inattention, marked impulsiveness, or marked hyperactivity, which cause the required marked impairments in age-appropriate cognitive/communicative function, social functioning, and personal functioning. (*Id.*) Nor did the ALJ find marked difficulties in maintaining concentration, persistence, or pace. (*Id.*) The ALJ decided that, despite his ADHD, Y.F. is able to satisfactorily meet grade-level expectations and has improved concentration and interaction with others while on medication. (*Id.*)

ALJ Feuer also concluded that Y.F.'s ADHD does not functionally equal the severity of the Listing because Y.F. does not have an impairment or combination of impairments that results in either marked limitations in two domains of functioning or an extreme limitation in one domain of functioning. (Tr. 22.) The ALJ found that Y.F. has a less than marked limitation in acquiring and using information, a less than marked limitation in attending and completing tasks, a less than marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, a less than marked limitation in the ability to care for himself, and no limitation in health and physical well-being. (Tr. 14-22.) Therefore, the ALJ imposed a finding of not disabled. (Tr. 22.)

### B. Accounting for the Structured Environment

When evaluating how a child's impairments affect his ability to function, the ALJ is required to consider how well the child can initiate, sustain, and complete his activities,

including the amount of help or adaptations he needs, and the effects of structured or supportive settings. 20 C.F.R. § 416.924a(b)(5). Y.F.'s special education classroom and individualized education program, in which teachers and school staff make adjustments to accommodate Y.F.'s behavioral and attention difficulties, is such a structured setting. *See* 20 C.F.R. § 416.924a(b)(5)(iv)(B). Because a structured setting often masks the symptoms of a disability and improves the child's ability to function within that supportive environment, the ALJ is instructed to consider the degree of limitation in functioning the child has or would have outside the structured setting. 20 C.F.R. § 416.924a(b)(5)(iv)(C). That is, an ALJ cannot appropriately evaluate the effects of Y.F.'s structured setting on his ability to function without identifying the nature of his structured setting and the amount of help he receives from it. *Gonzalez v. Astrue*, No. 1:07-cv-00487, 2009 WL 4724716, at *6-7 (N.D.N.Y. 2009).

Here, ALJ Feuer neglected to consider the nature and extent of Y.F.'s structured setting, the limitations in functioning he exhibits despite his placement in a sheltered environment, and how he would function if he did not have these support services. Evaluations provided by Y.F.'s teachers and school staff concerning Y.F.'s special education needs strongly and consistently suggest that his limitations require him to remain in a small, self-contained, special education class where he is assisted by a personal aide throughout the school day. For example, a NPS evaluation in 2012 notes Y.F.'s lack of focus, impulsivity, carelessness, violent behavior, and noncompliance with teachers' instructions. (Tr. 283-88, 322.) It was as a result of that evaluation that the NPS CST decided to place Y.F. in a small, self-contained, special education class for all of his academic subjects, provide him with special test accommodations, and assign him a full-time aide to control his violent behavior. (Tr. 302, 304, 307.) NPS confirmed its

decision to place Y.F. in such a restricted and structured learning environment in its 2013 annual review of Y.F.'s special education needs and accommodations. (Tr. 385-400.)

The ALJ's decision lacks analysis of the evidence showing Y.F.'s need for a structured school setting and consideration of how Y.F. would function without the special education services and individualized attention he receives from his special education classroom and personal aide. The ALJ is required to address evidence which supports an inference that the claimant's behavioral improvement is a result of his supportive environment, and not a result of actual progress in the child's underlying disability. *See Coleman v. Chater*, No. 2:96-cv-02091, 1997 WL 452192, at *5 (D.N.J. July 22, 1997). Thus, before the ALJ can find that "there is no evidence of marked inattention, marked impulsiveness and marked hyperactivity," pursuant to Listing 112.11, he must address the evaluations by the NPS CST and Y.F.'s teachers which placed him in a highly structured and restricted special education class. Similarly, before the ALJ can make a finding of "less than marked" in each of the six domains of functional equivalence, he must consider the extent to which the child's improvements are a result of the supportive services of his special education setting, and the extent to which those improvements are sustainable outside of that structured setting.

The ALJ's failure to explicitly weigh this evidence before arriving at a decision makes this case appropriate for remand. *See Dobrowolsky*, 606 F.2d at 407; *see also Cruz v. Comm'r of Social Security*, No. 2:08-cv-03721, 2009 WL 2448517, at *10 (D.N.J., Aug. 10, 2009) (remanding where the ALJ did not "explicitly consider the possibility that a structured or supportive setting . . . might have minimized the signs and symptoms of the plaintiff's impairment and helped to improve her functioning").

### C. Medical and Functional Equivalence

Plaintiff also objects to the ALJ's finding that Y.F.'s impairment is neither medically nor functionally equivalent to a Listing, claiming that this decision is not supported by substantial evidence. (Pl.'s Br. 17, 21-22.)

### *1. Medical Equivalence*

An ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" so that the appellate court may "perform its statutory function of judicial review." *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981). As such, the ALJ must include not only the evidence he considered in reaching his decision, but also identify the evidence rejected. *See id.* "[T]here is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." *Id.* at 706. It is error for an ALJ to accept "medical evidence and testimony that oppose[s] the claimant's position without explaining his reasons for rejecting the equally probative medical evidence and testimony supporting the claimant." *Wisniewski v. Comm'r of Soc. Sec.*, 210 Fed. App'x. 177, 179 (3d Cir. 2006) (citation omitted).

Here, there is insufficient explanation as to why ALJ Feuer dismissed the most recent reports from Y.F.'s doctor, teacher, and school staff showing that Y.F. is still struggling despite his medication and structured environment, before he decided that "there is no evidence of marked inattention, marked impulsiveness, and marked hyperactivity." (Tr. 12.) The Defendant argues that Y.F.'s medication succeeded in putting his ADHD in remission in early to mid-2013. (Def.'s Br. 16 ¶¶ 1-2.) Even if this is true, there is still a wealth of evidence in the record which strongly indicates that Y.F. regressed in the second half of 2013 and is currently suffering from marked inattention, impulsiveness, and hyperactivity.

For example, the NPS annual review of Y.F.'s need for special accommodations in June 2013 determined that he should remain in his special education class with his personal aide because of continuing behavioral and medical challenges. (Tr. 385-400.) In mid-late 2013, Y.F.'s caseworker, Brenda Rasbury, wrote multiple letters advising that Y.F. needed a new male aide to properly control his violent outbursts, and documenting Y.F.'s manipulative and argumentative nature, inability to follow rules and directions, lack of self-control, inability to focus, inconsistent performance, low frustration level, poor impulse control, poor social skills, self-isolation, disruptive behavior, and pattern of verbal outbursts. (Tr. 405-07.)

Moreover, in October 2013, two months after she requested teacher feedback and two weeks after the administrative hearing, Dr. Kaufman wrote a letter stating that Y.F.'s ADHD and Disruptive Behavior Disorder remained active, that he continued to present "severe problems with attention, hyperactivity, impulsivity, and physical aggression," and that addressing Y.F.'s behavioral problems requires "a structured environment and a high level of supervision with ongoing redirection and repeated instruction." (Tr. 340.)

To allow for meaningful judicial review, ALJ Feuer must examine and address this evidence, which contradicts his conclusion that Y.F.'s ADHD is in remission, and weigh it against that evidence which supports his conclusion,[4] before deciding whether Y.F. medically or functionally equals a Listing.

### 2. *Functional Equivalence*

For the reasons discussed above, ALJ Feuer also failed to adequately explain why he dismissed multiple recent reports from Y.F.'s doctor, teacher, and school staff indicating that

---

[4] Namely, Ms. Samaan's January 2013 appointment notes, (Tr. 367), and Dr. Belardinelli's May 2013 appointment notes, (Tr. 358). However, Dr. Kaufman's July and September 2013 appointment notes, which recorded that Y.F.'s ADHD appeared to be in remission, can be discounted in light of her October 2013 letter. (Tr. 340.)

Y.F. is still struggling before he concluded that Y.F. "does not have an impairment or combination of impairments that result in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning." (Tr. 22.)

Moreover, ALJ Feuer appears to have made factual errors in supporting his conclusion that Y.F. is not functionally disabled. First, ALJ Feuer states that Plaintiff testified that Y.F. was in a "summer program" and that he did very well behaviorally, that "she was never called in about his behavior, and that this turn for the positive continued with the new school year." (Tr. 13.) However, there does not appear to be any reference to a "summer program" or Y.F.'s behavior at that program in the instant record. (Pl.'s Br. 29.) Second, ALJ Feuer appears to misunderstand Plaintiff's testimony that she started giving Y.F. his Risperdal regularly within two to three months prior to the September 2013 administrative hearing, (Tr. 36), writing that "the mother regularly withheld risperdone[5] [sic] . . . [and] only started giving the claimant the risperdone [sic] within 2-3 months of his testimony." (Tr. 13.) However, Dr. Kaufman only prescribed the Risperdal on August 16, 2013, with instructions not to begin it until August 30, 2013, less than one month prior to the administrative hearing. (Tr. 345.)

Remand is appropriate where, as is the case here, relevant and probative evidence was not explicitly and accurately weighed in arriving at a decision on the plaintiff's claim for disability benefits. *See Dobrowolsky*, 606 F.2d at 403 (citation omitted). Remand will allow the ALJ to properly consider the assessments from Y.F.'s teachers, school staff, case worker, and doctors to ascertain whether those reports demonstrate that Y.F. meets or medically or functionally equals a listed impairment.

---

[5] Risperdal is the trade name of risperidone.

**CONCLUSION**

For the reasons stated above, the ALJ's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

s/ <em>Susan D. Wigenton</em><br>
**SUSAN D. WIGENTON**<br>
**UNITED STATES DISTRICT JUDGE**

Orig:   Clerk
cc:     Parties